| | | |
|---|---|---|
| **KRISTINA DELORCO,** | : | |
| **Plaintiff,** | : | |
| | : | **No. 3:16-CV-01594 (VLB)** |
| **v.** | : | |
| | : | |
| **WAVENY CARE CTR, INC.,** | : | **August 27, 2018** |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT [DKT. 23]

This action involves the alleged forced resignation of Kristina DeLorco ("Plaintiff" or "DeLorco") from her temporary employment with Waveny LifeCare Network, Inc. ("Defendant" or "Waveny"). Presently before the Court is Defendant's motion for summary judgment on Plaintiff's claims of age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 626(e), *et seq.*, and intentional infliction of emotional distress. For the following reasons, the Court GRANTS summary judgment on the age discrimination claim based on constructive discharge and hostile work environment. The Court also GRANTS summary judgment on the intentional infliction of emotional distress claim.

## Background[1]

The following facts are taken from the evidence as well as the facts in Defendant's Local Rule 56(a)(1) Statement supported by the evidence in light of Plaintiff's failure to file a Local Rule 56(a)(2) Statement. *See* **D. Conn. Civ. L. R. 56(a)3 ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1. . . .").**

Waveny is a rehabilitative center in New Canaan, Connecticut, devoted to care for elderly patients, and it provides inpatient, outpatient, home-based services.[2] In March of 2015, Waveny interviewed and hired Plaintiff for a temporary position while an employee was out on maternity leave. *See* [Dkt. 23-3 (Mot. Summ. J. Ex. B, Pl. Dep.) at 31:16–36:9]. Ms. DeLorco was approximately 53 years old when she was hired. *See id.* at 127:7–10. Patricia Palpini ("Palpini") interviewed, hired, and initially supervised Ms. DeLorco. *See id.* at 63:21–25, 87:12–24. Ms. DeLorco testified that Palpini is approximately her age. *See id.* at 65:22–66:3. Ms. DeLorco testified that her skillset was primarily clinical, and she did not have great administrative or computer skills. *See id.* at 59:2–21. She made this clear to Ms. Palpini before being hired. *See id.* at 127:24–28:7.

---

[1] Plaintiff requested leave to file a sur-reply to respond to an affidavit filed as an exhibit to Defendant's Reply. Aside from the fact that Plaintiff misfiled this motion as a "response," the Court did not grant the motion because it did not need to rely on Defendant's affidavit in rendering this decision and thus there did not exist good cause to file the sur-reply. *See* D. Conn. Civ. L. R. 7(d).

[2] The Court takes judicial notice that Waveny's website provides information about the organization and can be found at https://www.waveny.org/living-options-inpatient-care/waveny-care-center.html. *See* Fed. R. Evid. 201(b)(2).

Plaintiff testified she was told the woman on maternity leave would not return to her position for medical reasons, so the job would likely become permanent. *See id.* at 31:9–32:23. She was also told that Waveny intended to put Martha Lipowicz ("Lipowicz") in the position when it officially opened up because it was "one step up" for her. *See id.* at 32:15–23.

Ms. Lipowicz was assigned to be Plaintiff's preceptor during orientation. *See id.* at 75:5–19. Ms. DeLorco testified that Ms. Lipowicz got frustrated with her each time they attempted to complete a task. She testified: "She would take the papers. She would slam the computer screen. She would pick up pens and throw them across the desk. She would abruptly get up, slam the drawers and the cabinets above my head." *Id.* at 109:14–21. Ms. DeLorco testified that the only reason she knew of as to why Ms. Lipowicz was hostile toward her was because Lipowicz wanted her job. *See id.* at 93:9–25.

Ms. DeLorco acknowledged during her deposition that she was not the only person treated harshly by Ms. Lipowicz; rather, she felt "there was a lot of bullying going on," the problems "had nothing to do with [her]," and that people were also verbally abusive toward Lenore Consiglio. *See id.* at 90:4–91:25. Ms. DeLorco testified that Ms. Consiglio is older than her. *See id.* at 66:5–8. Plaintiff offered no evidence to support her surmise. She also testified that Ms. Lipowicz was rude to clients, hospital discharge, and home care staff in general. *See id.* at 124:3–18.

One week after Ms. DeLorco's first day, she complained to the Human Resources Department ("HR"). *See id.* at 96:1–13. Ms. DeLorco was later put in touch with the director of HR, Rebecca Albrecht, and did not have any difficulty

3

getting in touch with her.  *See id.* at 97:9–25.  She thereafter made several complaints to Ms. Albrecht.  *See id.* at 115:13–25.

In response to "the incident where [Ms. Lipowicz] was slamming the computer screen, throwing pens and slamming the door above [her] head," Ms. DeLorco had a meeting with Chief Executive Officer Bill Piper and Ms. Albrecht in April 2015.  *See id.* at 112:5–20, 114:9–115:25.  During this meeting, Ms. DeLorco implied but did not expressly state she was suffering from discrimination.  *See id.* at 125:2–16.  She also testified that, after she finished describing the office environment, "Bill seemed agitated, and he was very stern and stated to me, his statement was 'What you are describing here is grounds for a lawsuit,' and he was very angry, and I was taken aback."  *See id.* at 128:18–25.

When Ms. DeLorco asked whether she was treated differently because of her age, she testified, "I don't think I said age, but I know that I indicated to Bill that I was being treated differently for some reason, and I wasn't sure exactly what it was."  *See id.* at 125:19–22.  She then testified that she believed the treatment was related to her age, stating:

> It started with [Ms. Palpini] as I would repeatedly express my frustration to [Ms. Palpini] that I'm not learning the computer.  I'm not learning the system.  I keep getting shut out of the system.  I didn't understand why mechanically the computer system would shut down while I was using it and that I'm not real computer literate, and [Ms. Palpini], she didn't say explicitly that it is an age thing, but that the younger people are more in tune to the computer and that it is no big deal.

*Id.* at 126:7–19.  When asked to clarify whether Ms. Palpini said anything else about Ms. DeLorco's lack of computer knowledge and that it was "no big deal," Ms. DeLorco responded: "She said 'You will learn it.'"  *Id.* at 126:22–24.  Ms. DeLorco

also testified to the following about Ms. Palpini: "she indicated that <u>we</u> are slower at learning the technology." *See* [Dkt. 30-2 (Reply in Supp. of Mot. Summ. J. Ex. B, Pl. Dep.) at 166:14–22 (emphasis added)].

Shortly after the meeting with Mr. Piper and Ms. Albrecht, Carol Smith ("Smith") replaced Ms. Palpini as Ms. DeLorco's supervisor. *See* [Dkt. 29-2 (Obj. to Mot. Summ. J. Ex. B, Pl. Dep.) at 154:10–25]. Ms. DeLorco did not have any problems with Ms. Smith. *See id.* However, problems with Ms. Lipowicz persisted. On May 1, 2015, Ms. Lipowicz got frustrated with Ms. DeLorco and threw papers, threw a pen across Ms. DeLorco's desk, and kicked over a chair. *See* [Dkt. 23-3 at *id.* at 155:19–157:25]. Ms. DeLorco went to Ms. Smith's office whereupon Ms. Lipowicz entered, sat at a round table in front of Ms. Smith, and shook her fist at Ms. DeLorco and pounded it on the desk. *See id.* Ms. DeLorco subsequently called Ms. Albrecht. *See* [Dkt. 29-2 at 161:9–162:7].

On May 20, 2018, Ms. DeLorco attended a meeting with Ms. Smith and Ms. Albrecht. *See* [Dkt. 23-2 at 176:15–177:13]. Ms. DeLorco heard a discussion regarding Ms. Palpini's arrival, and at that moment she decided to hand in her badge, saying, "I can't take it." *See id.* She did not know about the content of the meeting or those who would be in attendance ahead of time. *See id.* Ms. DeLorco was never disciplined or alleged to have poor performance. *See id.* at 106:8–23.

Shortly thereafter, Ms. DeLorco applied for a position with Waverly. *See id.* at 181:16–182:12. She was told she would not have any problems with Ms. Palpini or Ms. Lipowicz, but when she learned they were still employees she resigned a second time. *See id.* at 182:1–25.

Ms. DeLorco never sought treatment and never consulted a physician about her distress related to the employment situation. *See id.* at 209:10–21. She claims to suffer from anxiety and fear, and described having these symptoms and an upset stomach when confronted by Ms. Lipowicz. S*ee id.* at 209:22–210:19; 213:3:23. She acknowledged having a history of anxiety and had been diagnosed with PTSD in 2005 after experiencing an assault. *See id.* at 210:20–211:20. Although she was put on medication, she had been taken off medication because it was not compatible with other medication she was taking. *See id.* at 211:14–19. She did not seek therapy after resigning from Waveny and does not currently receive therapy or take medication. *See id.* at 212:20–213:2.

## Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*,

No. 3:03-cv-00481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).   Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb*, 84 F.3d at 518. Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

<u>Analysis</u>

I.     <u>ADEA Discrimination</u>

The ADEA prohibits an employer from discriminating against an employee "because of" her age.  29 U.S.C. § 623(a)(1).  The statute protects employees who are at least forty years of age.  29 U.S.C. § 631(a).

In the Second Circuit, ADEA discrimination claims are analyzed using the burden-shifting framework for Title VII claims set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as slightly modified by the Supreme Court's subsequent decision in *Gross v. FBL Financial Services*, 557 U.S. 167 (2009). *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105–06 (2d Cir. 2010). Under this framework, the plaintiff bears "the initial burden of establishing a *prima facie* case of discrimination." *Id.* at 106 (citing *McDonnell Douglas*, 411 U.S. at 802). Plaintiff's burden for establishing a *prima facie* case is *de minimis*. *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) ("We have characterized plaintiff's *prima facie* burden as minimal and *de minimis*.") (quotation omitted). "If the plaintiff does so, the burden shifts to the defendant to articulate 'some legitimate, nondiscriminatory reason' for its action." *Gorzynski*, 596 F.3d at 106 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant then articulates a legitimate, nondiscriminatory reason for its action, the plaintiff "can no longer rely on the *prima facie* case, but may still prevail if she can show that the employer's [action] was in fact the result of discrimination." *Id.* (citing *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir.2008)). Finally, under the Supreme Court's decision in *Gross*, "'a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the but-for cause of the challenged adverse employment action' and not just a contributing or motivating factor." *Id.* (quoting *Gross*, 557 U.S. at 180).

### A. *Prima Facie Case*

To establish a *prima facie* case of age discrimination in violation of the ADEA, a plaintiff must show "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski*, 596 F.3d at 107. Defendant disputes that Plaintiff has established the second and third elements.

### 1. *Adverse Actions*

It is Defendant's position that Plaintiff fails to show an adverse action because she cannot show she was constructively discharged. "A 'discharge,' in satisfaction of the third element of the *prima facie* case, may be either an actual termination of the plaintiff's employment by the employer or a 'constructive' discharge." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993); *Interdonato v. Bae Sys. Inc.*, 16 F. App'x 25, 27 (2d Cir. 2001). To establish constructive discharge, a plaintiff must demonstrate the "employer, rather than discharging [the plaintiff] directly, intentionally creates a work atmosphere so intolerable that [s]he is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003); *Stetson*, 995 F.2d at 360 (defining constructive discharge as an employer "deliberately" making the work conditions "so intolerable" that the employee is "forced into an involuntary resignation"). "A court must find a constructive discharge where the employee resigns because an employer causes to exist conditions of such an unpleasant or difficult nature that any reasonable person in the employee's place would do the same." *Flaherty v. Metromail Corp.*,

235 F.3d 133, 138 (2d Cir. 2000); *Chertokva v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996) ("A constructive discharge occurs if a reasonable person subjected to the same conditions as the plaintiff would have felt compelled to step down.").

It is quite clear that Ms. DeLorco was subjected to a negative work environment from her first day of work on March 31, 2015, and this lasted until she resigned around May 20, 2015. Ms. Palpini "was very abrupt" in giving her a task on her first day. *See* [Dkt. 29-1 (Opp'n Ex. A, Pl. Dep.) at 73:2–12]. The second day, Ms. Lipowicz arrived at work and "started flipping out"; she threw papers around and was angry Ms. DeLorco had worked at her desk the previous day. *Id.* at 86:14–25. Both Ms. Lipowicz and Ms. DeLorco reported to Ms. Palpini during this time, and Ms. Palpini informed her the office was disorganized because there was a lot of transition. *See id.* at 88:7–17. Ms. DeLorco reached out to the HR department a week after her first day, asking Ms. Albrecht over the phone if there was a different position. *See id.* at 96:10–97:20. She thereafter made several calls to HR and complained of the office culture. *See id.* at 113:21–114:8.

There is no dispute that Ms. Lipowicz was known for having "a disposition problem." *See id.* at 102:2–17; 129:3–130:7. Ms. DeLorco described her as frequently "slamming papers," walking away from instructing Ms. DeLorco, hitting the computer screen, yelling at Ms. DeLorco, throwing pens across the desk, and slamming cabinets and drawers near Ms. DeLorco. *See id.* at 104:11–20; 109:14–21; 145:21–24.

After the first time that Ms. Lipowicz slammed the computer screen, threw pens, and slammed the door, Ms. DeLorco met with CEO Bill Piper and Ms. Albrecht in person. *See id.* at 112:8–20. This meeting occurred within days of the incident, at some point in April. *See id.* at 114:20–115:2. She complained about Ms. Palpini and Ms. Lipowicz and specifically described Ms. Lipowicz's rude demeanor towards not only Plaintiff, but also, clients, hospital discharge planners, home care staff. *See* [Dkt. 29-2 at 123:24–124:25]. Plaintiff did not tell Mr. Piper or Ms. Albrecht she believed she was treated badly because of her age. In response to her complaint, Mr. Piper expressed his concern that Ms. Lipowicz's behavior could constitute grounds for a lawsuit. *See id.* at 128:15–129:2. He explained to her that he was aware of the problem with Ms. Lipowicz and that Ms. Palpini was in the process of being replaced. *See id.* at 129:3–130:7. He assured her they were in the process of changing the situation and he encouraged her to stay because "things would get better." *See id.* Mr. Piper also asked her to "[l]ay low and hang in there" should Ms. Lipowicz or Ms. Palpini try to antagonize or intimidate her. *See id.* Shortly after, Carol Smith became Ms. DeLorco's new supervisor. *See id.* at 154:10–23.

Ms. DeLorco testified that she continued to experience incidents after the meeting. *See id.* at 143:4–9. Specifically, "[s]he would get frustrated and she would start throwing things and slamming the desk drawers, insisting that [Ms. DeLorco is] not doing what she is telling [her] to do." *See id.* at 145:20–24. She also described an instance in which Ms. Lipowicz leaned in closely to Ms. DeLorco, which mad her nervous. *See id.* at 148:10–149:6. Around May 1, 2015, Ms. Lipowicz

became frustrated with Ms. DeLorco over data input and threw a pen, kicked a chair back, and threw papers. *See id.* at 155:19–25. Ms. DeLorco went to Ms. Smith's office to report the incident, and Ms. Lipowicz entered the office twice while Ms. DeLorco was in there; the second time she balled her fist and pounded it on Ms. Smith's table while looking at Ms. DeLorco. *See id.* at 155:19–160:18. After Ms. Lipowicz left, Ms. Smith explained to Ms. DeLorco that she was not required to do input coding, that Ms. Lipowicz was probably frustrated because she had been doing the work longer and was more computer savvy, and she said "don't worry about" her lack of computer skills. *See id.* at 155:19–161:3. Ms. DeLorco thereafter called Ms. Albrecht on a date unknown to the Court. *See id.* at 161:14–18.

The Court cannot discern from Ms. DeLorco's testimony the frequency with which these instances occurred, as it appears she may have repeated stories at certain points during the deposition. For instance, she describes Ms. Lipowicz kicking over a chair on three occasions, but clarified when describing the third instance that Ms. Lipowicz only knocked a chair back once. *See id.* at 146:7–16; 149:18–150:8; 155:19–156:6.

The standard for proving constructive discharge is quite high: the "employer, rather than discharging [the plaintiff] directly, intentionally creates a work atmosphere so intolerable that [s]he is forced to quit involuntarily." *Terry*, 336 F.3d at 152. It is undisputed that Mr. Piper, Ms. Albrecht, and Ms. Palpini all knew that Ms. Lipowicz had a disposition issue and mistreated Ms. DeLorco amongst other people. Mr. Piper recognized Ms. Lipowicz's behavior could be grounds for a lawsuit, and the fact Ms. Lipowicz's behavior continued after the

meeting indicates Defendant failed to effectively respond. But this does not mean Waveny intentionally created an intolerable work atmosphere; rather, the evidence suggests Mr. Piper and Ms. Albrecht were actively engaged in reorganizing the team to improve the work environment. Not long after the meeting, Ms. Smith replaced Ms. Palpini as Ms. DeLorco's supervisor. When the problems persisted, they organized a meeting with Ms. DeLorco, which consisted of the HR department and other current and past supervisors. Even after Ms. DeLorco resigned, the HR department encouraged her to apply for a position and assured her that she would not experience the same issues. A reasonable juror would not find that Waveny constructively discharged Ms. DeLorco.

### 2. *Inference of Discriminatory Intent*

Assuming *arguendo* that Waveny did constructively discharge Ms. DeLorco, it is not enough simply to show the work atmosphere caused the plaintiff to resign. In addition, the constructive discharge must have "occurred under circumstances giving rise to an inference of discrimination" on the basis of the plaintiff's age. *Gorzynski*, 596 F.3d at 107; *see Terry*, 336 F.3d at 152. "Proof of such a causal connection can be established directly through evidence of retaliatory animus directed against a plaintiff, or indirectly by showing that the protected activity was followed closely by discriminatory treatment . . . through other evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Terry*, 336 F.3d at 152 (internal quotation marks omitted). Notably, a plaintiff cannot demonstrate such an inference merely by showing "the employee's working conditions were difficult or unpleasant." *Stetson*, 995 F.2d at 360; *Chertokva*, 92

F.3d at 90 (citing with approval *Stetson* and its ruling on difficult or unpleasant conditions). Put another way, a plaintiff cannot get past summary judgment "based only on the employee's subjective beliefs about [her] working conditions." *Miller v. Praxair*, No. 3:05-cv-402 (CFD), 2009 WL 1748026, at * 7 (D. Conn. June 18, 2009) (quoting *Zephyr v. Ortho McNeil Pharm.*, 62 F. Supp. 2d 599, 608 (D. Conn. 1999)). Where there are multiple examples of working conditions that do not necessarily show discriminatory intent standing alone, the court must consider them together, "[b]ecause a reasonable person encounters life's circumstances cumulatively and not individually. . . ." *Chertokva*, 92 F.3d at 90.

Defendant argues there is no evidence of an inference of discrimination because Ms. Palpini's age-related comments were mere stray remarks. "Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff." *Schrieber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518–19 (S.D.N.Y. 2004); *see Herbert v. Nat'l Amusements, Inc.*, 833 F. Supp. 2d 192, 199 (D. Conn. 2011) (acknowledging a stray remark does not show discriminatory animus unless there is a causal connection to the adverse action). When determining whether a comment reflects an intent to discriminate, a court may consider the following: "(1) who made the remark, i.e. a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e. whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e. whether it was related to the decisionmaking

process." *McInnis v. Town of Weston*, 375 F. Supp. 2d 70, 83 (D. Conn. 2005) (quoting *Schrieber*, 324 F. Supp. 2d at 518); *see Fried v. LVI Servs., Inc.*, 500 F. App'x 39, 41 (2d Cir. 2012) (applying the stray remark factors set forth in a Title VII case, *Henry v. Wyeth Pharm.*, 616 F.3d 134 (2d Cir. 2010), to the ADEA context). "The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

The only age-related comments come from Ms. Palpini, who was Ms. DeLorco's direct supervisor for a period of a few short weeks. Ms. DeLorco testified several times that Ms. Palpini commented on her age. The first description is as follows:

> It started with [Ms. Palpini] as I would repeatedly express my frustration to [Ms. Palpini] that I'm not learning the computer. I'm not learning the system. I keep getting shut out of the system. I didn't understand why mechanically the computer system would shut down while I was using it and that I'm not real computer literate, and [Ms. Palpini], she didn't say explicitly that it is an age thing, but that the younger people are more in tune to the computer and that <u>it is no big deal</u>.

*See* [Dkt. 29-2 at 126:7-19 (emphasis added)]. Ms. DeLorco also testified that Ms. Palpini said, "You will learn it," with respect to Ms. DeLorco's lack of computer knowledge being no big deal. *Id.* at 126:22–25. The second description is similar— Ms. Palpini described the job as having "an age-related learning curve" that was easier for younger people who have more experience with using computers. *See id.* at 166:14–22. Ms. DeLorco testified that "she indicated that <u>we</u> are slower at learning the technology" and that Ms. Lipowicz was the only younger person. *Id.*

(emphasis added).  When asked to explain further, Ms. DeLorco stated, "[S]he alluded to my inability to be able to learn the technology, and she was making an excuse.  It was because I'm older and that I'm not as computer savvy. . . ."  *Id.* at 168:6–20.  Ms. DeLorco clarified that Ms. Palpini initially stated a lack of computer experience was okay but that this changed:

> She said initially that it was okay, and I was under the impression that it was okay until she came out with a comment saying that when I was more direct in my frustration in not being able to learn the computer system, that is when she said that—she didn't say it was okay.  She said that there is a learning curve, and that the younger people use this all the time, and it is okay that—she didn't say it is okay, but there is a frustration here, okay, that I'm not able to learn the computer, and she made it seem like it was an age thing, and maybe I'm not incapable of learning it, but there is definitely a difference in the mindset of, you know.

*Id.* at 169:21–170:10.

        In considering the four factors, the Court concludes Ms. Palpini's statements were clearly stray and non-probative of discriminatory intent.  Her reference to Ms. DeLorco's age is connected to Ms. DeLorco's frustration and a reasonable person would find the comment to be an acknowledgment of that frustration, not an expression of Ms. Palpini's own frustration.  After all, Ms. Palpini put herself in the same category when she said "<u>we</u> are slower at learning technology."  *See id.* at 166:14–22.  Even Ms. DeLorco's attempt to explain Ms. Palpini's discriminatory animus—"she made it seem like it was an age thing, and maybe I'm not incapable of learning it, but there is definitely a difference in the mindset of, you know"— reflects Ms. DeLorco's self-doubt about learning computer-related skill, not Ms. Palpini's doubts.  *Id.* at 169:21–170:10.  Ms. Palpini made it quite clear that Ms. DeLorco did not need strong computer skills during the interview, and she

maintained this position while Ms. DeLorco was employed by allowing her to withhold from coding. *See id.* at 145:7–146:6. Moreover, Ms. Palpini's allegedly age related comments were understanding and encouraging, not deprecating. They were not indicative of age animus. The Court finds Ms. DeLorco's characterization of Ms. Palpini's age-related comments merely reflects her subjective beliefs about her working condition, which is insufficient to survive summary judgment. *See Miller*, 2009 WL 1748026, at * 7.

"Stray remarks alone are insufficient to defeat summary judgment." *Martinez v. N.Y.C. Transit Auth.*, 672 F. App'x 68, 71 (2d Cir. 2016). However, a court cannot evaluate the comments in isolation, determine they are not probative, and then disregard them without considering the broader conditions. *See Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 284 (D. Conn. 2008) ("[T]he court should not categorize a remark as 'stray' or 'not stray' and then disregard that remark if it falls under the 'stray' category. Instead, the court must consider all the evidence in its proper context.") (citing *Tomassi*, 478 F.3d at 115–16). Here, the broader context includes Ms. Palpini's curt behavior when Ms. DeLorco visited her office. The Court does not find this behavior to be connected to Ms. Palpini's age-related comments in any discriminatory way, as it appears many people often visited her office including Ms. DeLorco, and it was not Ms. Palpini's role to train her; while she appears to have a gruff supervisory style, there is no evidence to suggest she treated Ms. Palpini differently because of her age.

There is no evidence in the record that suggests Ms. Lipowicz's behavior was because of Ms. DeLorco's age. Plaintiff does not allege that Ms. Lipowicz's

made an age related comment. Instead, Plaintiff admits Ms. Lipowicz's criticized her because of poor work performance. Plaintiff herself posits two additional nondiscriminatory reasons for Ms. Lipowicz's behavior. Ms. DeLorco testified that Ms. Lipowicz wanted her job. *See* [Dkt. 29-1 at 164:4–9]. Moreover, Plaintiff admitted Ms. Lipowicz's was rude generally and that she mistreated everyone, clients, clinicians, and staff alike. *See* [Dkt. 29-2 at 123:24–124:18].[3] In order to maintain an ADEA claim, age must be the but-for cause of the adverse employment action. *Gorzynski*, 596 F.3d at 106 (quoting *Gross*, 557 U.S. at 180).

For the above reasons, the Court concludes Ms. DeLorco fails to demonstrate a *prima facie* case for discriminatory treatment based on her age. Defendant did not provide the court with a legitimate, non-discriminatory reason for alleged discriminatory treatment, but this is of no consequence because Plaintiff failed to establish her initial burden and the burden of persuasion did not shift to the Defendant. Summary judgment is therefore GRANTED on Plaintiff's age discrimination claim with respect to constructive discharge.

### B. *Hostile Work Environment*

While an ADEA discrimination case may be established by "an employer's discrete acts of discrimination," it may also occur where there is a hostile work environment. *See Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 166 (E.D.N.Y. 2015) (citing *Terry v. Ashcroft*, 336 F.3d 126, 148 (2d Cir. 2003)). Hostile work environment and constructive discharge claims "are often premised

---

[3] To the extent Ms. DeLorco believes Mr. Piper and Ms. Albrecht handled the Ms. DeLorco's complaint with discriminatory intent, there is no evidence supporting this allegation.

on the same type of non-discrete conduct . . . although the standard for constructive discharge is higher." *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 309 (N.D.N.Y. 2013). The difference is a hostile work environment requires a plaintiff to "show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gorzynski*, 596 F.3d at 102 (addressing hostile work environment under Title VII); *see Terry*, 336 F.3d at 147–48 ("The same standards apply to hostile work environment claims brought under the ADEA."). A plaintiff need not show, however, that she was compelled to quit involuntarily, like she would in a constructive discharge claim. *See Flaherty v. Metromail Corp.*, 235 F.3d 133, 138 (2d Cir. 2000).

### 1.    *Severity of the Conduct*

A hostile work environment exists where the alleged harassment was "pervasive enough to create an objectively hostile or abusive work environment" and "subjectively perceive[d] [by the plaintiff as] abusive." *Terry*, 336 F.3d at 148 (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)). When determining whether a hostile work environment exists, courts may consider the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

In considering these factors, the Court finds that Plaintiff was not subject to an objectively hostile or abusive work environment. As the Court explained above, the only evidence of discriminatory conduct was a stray remark by Ms. Palpini related to Plaintiff's ability to learn the computer. The comment was far from severe; rather, it was made in solidarity with Plaintiff. Ms. Palpini indicated that she and Plaintiff were both slower at learning technology, but that Plaintiff would learn it. *See* [Dkt. 29-2 at 166:14-22]. No other age related actions were taken against Plaintiff. Although there is no question that Ms. Palpini and Ms. Lipowicz made Plaintiff's work environment difficult, Plaintiff admitted that bullying was common at Waverly and problems with Ms. Palpini and Ms. Lipowicz predated her employment. *Id.* 87:8–91:8. A reasonable juror would not find that Ms. DeLorco suffered from an objectively hostile work environment.

## 2. *Inference of Discriminatory Intent*

As with Plaintiff's constructive discharge claim, the Court assumes *arguendo* that Waveny's conduct was severe and pervasive enough to create hostile work environment. Plaintiff, however, fails to meet her burden to show that the "alleged hostility was based on a prohibited factor." *Terry*, at 336 F.3d at 150. The Court has evaluated Ms. DeLorco's entire deposition along with the other evidence submitted by the parties and determined that Ms. DeLorco simply cannot show evidence of "*discriminatory* intimidation, ridicule, and insult" for all the same reasons she fails to show discriminatory intent in her constructive discharge claim. *Gorzynski*, 596 F.3d at 102 (emphasis added). Plaintiff's sole piece of evidence attempting to show discriminatory intent—remarks by Ms. Palpini—fail to show any

discriminatory animus even when considered in the broader context of Ms. Palpini's curt behavior towards Plaintiff.

This is a case where one or two employees created a highly unpleasant environment. However, there is simply no evidence connecting it to age discrimination. Plaintiff has not introduced evidence from which a reasonable juror could infer discriminatory intent. For these reasons, the Court finds that Plaintiff's age discrimination with respect to hostile work environment fails as a matter of law and therefore, summary judgment is GRANTED.

## II. Intentional Infliction of Emotional Distress

"It is well established that an employer is liable for the willful torts of his employee when they are committed within the scope of his employment and in furtherance of the employer's business." *Cardona v. Valentin*, 160 Conn. 18, 22, 273 A.2d 697, 699 (Conn. 1970); *see Robbins v. Physicians for Women's Health, LLC*, 311 Conn. 707, 722, 90 A.3d 925, 934 (Conn. 2014) ("Employers are likewise deemed connected because, to the extent the tortious conduct occurred within the scope of the employment relationship, employees are viewed as having acted on behalf of their employers."). Defendant does not contest is its liability for Ms. Lipowicz's conduct.

To prevail on an intentional infliction of emotional distress claim, the Plaintiff must demonstrate: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress

sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210, 757 A.2d 1059, 1062 (Conn. 2000) (quotations and citations omitted). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." *Id.* Defendant challenges the second and fourth elements.

A. <u>*Nature of the Conduct*</u>

"Liability for intentional infliction of emotional distress requires conduct that exceeds 'all bounds usually tolerated by decent society. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* at 210-11 (quotations and citation omitted). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, [']Outrageous!'" *Morrissey v. Yale Univ.*, 268 Conn. 426, 428 (2004) (quoting *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 443, 815 A.2d 119, 126 (Conn. 2003)).

The sum and substance of Ms. Lipowicz's conduct is that she threw, slammed down, and shook papers; hit the computer screen in front of Ms. DeLorco; yelled in Ms. DeLorco's face; spoke to Ms. DeLorco close to her face; threw pens in Ms. DeLorco's direction; slammed a cabinet and desk drawers near Ms. DeLorco. *See* [Dkt. 29-2 at 86:16–87:5; 104:11–20; 109:14–21; 147:12–148:20; 164:12–166:8]. On May 1, 2015, Ms. Lipowicz became angry, kicked her chair back and it fell over next to Ms. DeLorco, and then clenched her fist at Ms. DeLorco and pounded it on

the table when they were later in Ms. Smith's office regarding the issue.  *See id.* at 155:19–159:10; 165:16–166:8.[4]

Courts do not typically grant summary judgment where physical violence or physical intimidation has occurred.  *See Arnold v. Thermospas, Inc.*, 49 Conn. Supp. 103, 108, 863 A.2d 250, 254 (Super. Ct. 2004) (denying motion to strike intentional infliction of emotional distress claim where the employer "trapped [the employee] in his chair by leaning over him" and "lean[ed] over [a second employee] in a threatening manner and prevented him from getting up from his chair"); *Cole v. Terrell Moorehouse*, No. CV990427337S, 2002 WL 31304178, at *3 (Conn. Super. Ct. Sept. 18, 2002) ("These allegations, of physical contact or physical threats are sufficient to put into issue whether or not the conduct of the defendant was, in fact, extreme or outrageous."); *Oppenheim v. Gruell*, No. CV030472301S, 2005 WL 407594, at *11 (Conn. Super. Ct. Jan. 11, 2005) (denying summary judgment where there was evidence of "physically intimidating behavior coupled with vulgar treatment in a setting which would have had to have been humiliating").  While there is scant evidence on the number of times Ms. Lipowicz's physically threatening acts were committed, the Court finds reasonable minds could disagree as to whether the conduct is extreme and outrageous, and therefore this is an issue for the jury to decide.  *See Appleton*, 254 Conn. at 210.

---

[4] Plaintiff includes examples of Ms. Palpini's dismissive conduct and an instance in which she yelled.  She also alleges Ms. Albrecht knew about all instances but did nothing.  The Court previously decided on the motion to dismiss that Ms. Palpini's actions did not rise to the level of intentional infliction of emotional distress and Plaintiff has not provided any evidence leading the Court to revisit this issue.

## B. *Severity of the Emotional Distress*

Even if a jury were to find Ms. Lipowicz's conduct is extreme and outrageous, it would still have to find Ms. DeLorco's emotional distress to be severe. The mental distress suffered must be "of a very serious kind." *Muniz v. Kravis*, 59 Conn. App. 704, 708, 757 A.2d 1207, 1211 (Conn. App. Ct. 2000). While Connecticut courts have not created a bright-line test for determining the requisite level of severity, courts frequently consider intensity and duration of the harm as relevant factors. *See Pasquale Civitella, PPA v. Pop Warner Football*, No. CV095010392S, 2012 WL 4466146, at *4 (Conn. Super. Ct. Sept. 5, 2012); Restatement (Third) of Torts § 46 (2012) (listing duration and intensity as relevant factors). The Restatement of Torts explains the high bar that the severity component poses:

> Complete emotional tranquility is seldom attainable in this world, and some degree of emotional harm, even significant harm, is part of the price of living in a complex and interactive society. Requiring proof that the emotional harm is severe (and the result of extreme and outrageous conduct) provides some assurance that the harm is genuine. Thus, the law intervenes only when the plaintiff's emotional harm is severe and when a person of ordinary sensitivities in the same circumstances would suffer severe harm. There is no liability for emotional harm suffered only because of the unusual vulnerability of a victim, unless the actor knew of that special vulnerability.

Restatement (Third) of Torts § 46 (2012). Certain "highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea" can constitute severe emotional distress. *Pasquale Civitella*, 2012 WL 4466146, at *4. But even where these are present, liability is only warranted when a reasonable person could not be able to endure such harm. *See id.*

There is simply no evidence that Ms. DeLorco was subjected to *severe* emotional distress. Ms. DeLorco testified to experiencing anxiety and fear. *See, e.g.,* [Dkt. 23-2 at 209:10–210:19]. She also testified to having an upset stomach, crying on her second day, and feeling nervous with Ms. Lipowicz while still employed. *See, e.g., id.* at 89:12–21; 148:23–149:6; 213:3–23; 214:19–215:14. However, this distress does not rise to the level of severe. Ms. DeLorco never sought treatment or took medication; considering she has a history of anxiety for which she took medication and was previously diagnosed with PTSD, a reasonable juror would not be able to conclude this particular experience caused her *severe* distress. *See Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 529, 43 A.3d 69, 102 (Conn. 2012) (finding insufficient that the plaintiff "became frightened and choked up upon being told that her career might be in jeopardy" because there was no evidence of distress for an extended period or the plaintiff seeking medical treatment); *Pasquale Civitella*, 2012 WL 4466146, at *4 (recognizing "[a]nother court has found that, when a plaintiff alleging severe emotional distress has failed to seek medical treatment, the injury is not sufficiently severe") (internal quotation marks omitted).

Plaintiff's own descriptions of her anxiety and fear do not suffice to defeat summary judgment. A plaintiff is not required to seek medical treatment or be diagnosed with a mental ailment to prevail on a claim for noneconomic damages under Connecticut law. *Patrolmen's Benevolent Ass'n of City of N.Y. v. City of N.Y.*, 310 F.3d 43, 55 (2d Cir. 2002) ("Evidence that a plaintiff has sought medical treatment for the emotional injury, while helpful, is not required."). However, a

plaintiff must offer more than her own testimony describing her emotional distress. *Id.* at 55 (evidence of medical treatment is not required, but "a plaintiff's testimony of emotional injury must be substantiated by other evidence"); *Aviles v. Wayside Auto Body, Inc.*, 49 F. Supp. 3d 216, 229 (D. Conn. 2014) (dismissing claims for intentional infliction of emotional distress where plaintiff "failed to allege any facts to support the severity of their distress such as medical treatment or the testimony of family members' or friends' observations of behavior manifesting mental distress of a very serious kind"); *Neclerio v. Trans Union, LLC*, 983 F. Supp. 2d 199, 215 (D. Conn. 2013) (finding personal testimony of emotional distress insufficient to support claim for emotional damages); *Rinaldi v. Laird*, 3:14-cv-091, 2016 WL 4179837, *8 (D. Conn. Aug. 5, 2016) (same). Here, Plaintiff failed to offer any corroboration for her claim of emotional distress.

Plaintiff's claim of emotional distress is further undermined by the fact that she applied for the same position shortly after she resigned. *See* [Dkt. 23-2 at 181:16–182:12]. The Court finds that as a matter of law, Ms. DeLorco's emotional distress does not rise to the level of severity required to recover. Therefore, summary judgment is GRANTED as to this claim.

<u>Conclusion</u>

For the above reasons, the Court GRANTS summary judgment on the grounds that Plaintiff has failed to establish (a) a *prima facie* case of age discrimination based on constructive discharge, (b) a *prima facie* case of age discrimination based on hostile work environment, and (c) a viable intentional infliction of emotional distress claim.

**IT IS SO ORDERED.**

_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**


**Dated at Hartford, Connecticut: August 27, 2018**